# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIE DIXON, #370-835, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. CCB-17-2464 |
| WEXFORD MEDICAL, | * | |
| Defendant. | * | |
| | *** | |

## MEMORANDUM OPINION

On August 25, 2017, self-represented plaintiff Willie Dixon, presently incarcerated at the Roxbury Correctional Institution in Hagerstown, Maryland, filed this civil action pursuant to 42 U.S.C. § 1983 against defendant Wexford Health Sources, Inc. ("Wexford"), the prison healthcare provider. ECF No. 1. Dixon claims that he has been taking the drug Humira and therefore needs annual medical checkups with Dr. Siaton, which Wexford allegedly denies. *Id.* at 4-5. He seeks an order directing Wexford to allow the yearly visits. *Id.* at 4.

On December 22, 2017, Wexford filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 12. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court informed Dixon that the failure to file a response in opposition to Wexford's Motion could result in dismissal of the Complaint. ECF No. 13. Dixon did not respond. After review of the record, exhibits, and applicable law, the court deems a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2016). Wexford's Motion shall be construed as a Motion for Summary Judgment and shall be granted.

### Background

Dixon is a 52-year old male inmate with a medical history significant for Behcet's

syndrome,[1] panuveitis,[2] and cataracts. *See* ECF No. 12-4; ECF No. 12-5 at ¶4.[3] He states that he has been taking the drug Humira[4] for almost three years and is, therefore, required to have annual visits with Dr. Bernadette Siaton, an offsite rheumatologist who, he alleges, can best examine the effects of the drug on his bones. ECF No. 1 at 4; ECF No. 1-1. Dixon claims that Wexford has failed to provide adequate medical care by denying him the required visits. *Id.*

Dixon's medical records reflect that on January 18, 2017, he was denied a follow-up visit with an offsite rheumatologist, and the alternative treatment plan was to monitor his condition onsite. ECF No. 12-4 at 3. On January 22, 2017, Dixon saw a nurse and inquired about the status of his rheumatologist consult. *Id.* at 1. The nurse emailed the scheduler and provider to research the status of the consult. *Id.* On January 26, 2017, Dixon was referred to a provider for a determination of the consult disposition. *Id.* at 3.

On February 3, 2017, Dixon was seen by Ava Joubert, M.D. *Id.* at 4-5. Dixon complained of continued right lower quadrant pain and discomfort, associated with occasional nausea and dysuria,[5] and stated that he often had dark urine and had lost about 20 lbs. in the past year. *Id.* Dixon believed that his symptoms were possibly related to taking Humira. *Id.* At that

---

[1] Behcet's disease, also known as Behcet's syndrome, is a rare disorder that causes blood vessel inflammation throughout the body, including the eyes. *See* https://www.mayoclinic.org/diseases-conditions/behcetsdisease/symptoms-causes/syc-20351326 (last visited July 13, 2018.

[2] Panuveitis is a serious inflammation of the uveal tract of the eye, which includes the iris, the ciliary body, and the choroid. *See* https://www.medicinenet.com/script/main/art.asp?articlekey=169649 (last visited July 13, 2018). "Panuveitis also typically involves the retina and the vitreous humor. Panuveitis can be caused by infections, chronic inflammatory diseases, or its cause may be unknown." *Id.*

[3] All citations to filings refer to the pagination assigned by the court's electronic docketing system.

[4] Humira (adalimumab) is a tumor necrosis factor blocker that reduces the effects of a substance in the body that can cause inflammation. *See* https://www.drugs.com/humira.html (last visited July 13, 2018). It is used to treat many inflammatory conditions in adults. *Id.*

[5] Dysuria is a symptom of pain, discomfort, or burning when urinating. *See* https://www.webmd.com/women/dysuria-causes-symptoms#1 (last visited July 13, 2018).

2

time, Dr. Joubert noted that Dixon had persistent neutropenia[6] and a recent rise in the AST.[7] *Id.*

On February 14, 2017, Dixon had a follow-up visit with Dr. Joubert, who requested an abdominal ultrasound. *Id.* at 6-7. By that time, Dixon had been taking Bactrim for three months without alleviating his prostatitis[8] symptoms. *Id.* During the visit, Dixon told Dr. Joubert the rheumatologist had stated that the symptoms might be related to his pancreas. *Id.* Dr. Joubert planned to complete the ultrasound first, and then submit a request for a follow-up with the rheumatologist. *Id.* She advised Dixon to continue taking Humira. *Id.*

On March 8, 2017, Dixon had the abdominal ultrasound. *Id.* at 8. On March 17, 2017, Dixon was seen by Mahboobeh Memarsadeghi, M.D. *Id.* at 9-11. Again, Dixon was noted to have been on Humira for two years but continued to have right lower quadrant pain and discomfort, associated with occasional nausea and dysuria, no hematuria. *Id.* Dixon's ultrasound was unremarkable except for bilateral cysts in the kidneys, one measuring 19mm in the right, and two, measuring 1.4cm and 2cm, in the left. *Id.*

On March 22, 2017, Dixon was denied a follow-up rheumatology consult and a course of urine dip sticks with follow up in three months was recommended as an alternative treatment plan. *See id.* at 12-13, 16.

On April 19, 2017, Dixon saw Crystal Jamison, P.A. to review his ultrasound results. *Id.* at 14. On May 16, 2017, Dixon again saw Jamison, who reviewed his urine dip stick and

---

[6] Neutropenia is an abnormally low level of neutrophils, which are a common type of white blood cell important to fighting off infections. *See* https://www.mayoclinic.org/symptoms/neutropenia/basics/definition/sym-20050854 (last visited July 13, 2018).

[7] The aspartate aminotransferase (AST) test is a blood test that checks for liver damage. *See* https://www.webmd.com/a-to-z-guides/aspartate_aminotransferse-test#1 (last visited July 13, 2018).

[8] Prostatitis is swelling and inflammation of the prostate gland that often causes painful or difficult urination. *See* https://www.mayoclinic.org/diseasesconditions/prostatitis/symptoms-causes/syc-20355766 (last visited July 13, 2018). Other symptoms include pain in the groin, pelvic area or genitals, and sometimes flu-like symptoms. *Id.*

urinalysis treatment plan. *Id.* at 16-17. At that time, Dixon expressed dissatisfaction and felt that he should see a rheumatologist. *Id.* Jamison informed Dixon he could successfully be monitored onsite. *Id.* Dixon refused to give a urine specimen or to have his vitals taken, and stated that he was going to self-terminate taking Humira. *Id.* Jamison advised Dixon to continue taking his medication. *Id.*

On June 6, 2017, Dixon saw a nurse during a sick call to inquire about the urinalysis. *Id.* at 18. He stated that he had stopped taking all his medications due to the renal cysts. *Id.* In response, the nurse educated Dixon on cysts and advised him to comply with his medication orders. *Id.* Dixon agreed to take his medications. *Id.*

On June 14, 2017, Dixon saw Dr. Memarsadeghi at chronic care. *Id.* at 20-22. Dixon had no complaints but wanted to know how much longer he needed to be on Humira. *Id.* Again, he indicated a belief that the renal cysts were related to Humira. *Id.* Dr. Memarsadeghi informed Dixon that the conditions were separate and not caused by his medication. *Id.* A urinalysis was ordered. *Id.*

On August 25, 2017, Dixon initiated this action. ECF No. 1. Soon thereafter, on August 30, 2017, Dixon saw Dr. Memarsadeghi at chronic care. ECF No. 12-4 at 23-25. At that time, Dixon's Humira medication was on hold due to neutropenia and fever. *Id.* Dixon also had diarrhea and nausea. *Id.* He was started on an empirical course of antibiotics, chest x-rays and lab work were ordered, and a consult for rheumatology was submitted. *Id.*

On September 6, 2017, the rheumatology consult was approved. *Id.* at 35. On September 20, 2017, Dixon again saw Dr. Memarsadeghi. *Id.* at 26-28. Dixon's lab work was negative for invasive organisms, his white blood cell count had returned to normal, and he was afebrile. *Id.* Dixon was stable to start Humira again, but a consult for gastroenterology was submitted. *Id.*

4

On September 27, 2017, the gastroenterology consult was denied and three stool guiac tests were recommended as an alternative treatment plan. *Id.* at 29-30.

On October 18, 2017, Dixon had a visit with Jamison. *Id.* at 31-32. Dixon reported that he had completed the three guiac stool cards, all of which were negative. *Id.* Dixon also reported that his vision was improving since restarting Humira. *Id.*

On October 30, 2017, Dixon had an offsite visit with Dr. Siaton. *Id.* at 33-34. At that time, Dixon was determined to be in remission of his Behcet's syndrome. *Id.* Dixon had elevated blood pressure but his exam was otherwise unremarkable. *Id.* Dr. Siaton noted that Dixon's prescription for Humira was reduced from 40mg to 20mg every 14 days, and that he used prednisone eye drops as needed. *Id.* Dr. Siaton recommended that Dixon continue these medications. *Id.*

According to Dr. Memarsadeghi, Dixon continues to be monitored regularly by medical personnel as a chronic care inmate for his chronic conditions. ECF No. 12-5 at ¶5. Dixon also continues to have access to more immediate medical care though use of the sick call process. *Id.* at ¶8.

**Standard of Review**

I.  **Motion to Dismiss**

In reviewing a complaint in light of a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), unsupported legal conclusions, *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), and conclusory factual allegations devoid of any reference to particular events, do not suffice, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## II.     Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The court reviewing the motion must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing

6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 522 (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

## Analysis

Wexford seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), or summary judgment under Rule 56. ECF No. 12. In support, Wexford argues that (1) Dixon has not stated any cause of action pursuant to § 1983; (2) Wexford is entitled to judgment as a matter of law; and (3) Dixon is not entitled to injunctive relief. ECF No. 12-1.

### I. Wexford's Liability

As a threshold matter, it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (finding no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009). To the extent that Dixon seeks to hold Wexford liable based on supervisory liability, he fails to identify in his pleadings a Wexford policy or procedure that proximately caused a violation of his rights. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Accordingly, the claims against Wexford must be dismissed. *See Love-Lane*, 355 F.3d at 782-83.

Although Dixon cannot prevail against Wexford, the court will further examine whether the record supports a finding that Wexford employees failed to provide adequate medical treatment for Dixon's conditions.

## II. Denial of Medical Care

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (citations and emphasis omitted). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. "[M]any acts or omissions that would constitute medical malpractice will not

8

rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.*

Here, Dixon claims that Wexford has not allowed him to visit Dr. Siaton. ECF No. 1. However, Dixon's medical records show that Dixon has seen Dr. Siaton as recently as October 30, 2017. *See* ECF No. 12-4 at 33. Further, an Eighth Amendment claim is not presented where, as here, Dixon alleges that Wexford has not provided the exact medical treatment that he desires. The medical staff's initial denial of his request to see a rheumatologist does not constitute deliberate indifference to a serious medical need. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970)). In this case, there are no exceptional circumstances, as Dixon's medical condition has been closely monitored by Wexford's staff for the past year. Wexford, therefore, has not been deliberately indifferent to Dixon's medical needs.

In light of the undisputed facts, Dixon cannot prevail on his claims and summary judgment in favor of Wexford is appropriate.

### III. Injunctive Relief

To the extent that Dixon seeks an order requiring annual visits with Dr. Siaton, he seeks injunctive relief. *See* ECF No. 1. A preliminary injunction is an "extraordinary and drastic

remedy." See *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) "that he is likely to succeed on the merits;" 2) "that he is likely to suffer irreparable harm in the absence of preliminary relief;" 3) "that the balance of equities tips in his favor;" and 4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Dixon fails to demonstrate that he is likely to succeed on the merits or that he is likely to suffer irreparable harm absent preliminary injunctive relief from this court. From the medical records and the declaration under oath pertaining to his care, it is clear that Dixon is receiving medical attention for his complaints, although it may not be the exact treatment he requests. Injunctive relief is thus not appropriate under these circumstances.

## Conclusion

The court determines that no genuine issue as to any material fact is presented and defendant is entitled to a judgment as a matter of law. Summary judgment shall be entered in favor of defendant by separate Order.

7/18/18

_____
Catherine C. Blake
United States District Judge